GRINNELL MUTUAL REINSURANCE
COMPANY, Appellee,

v.

Dale RECKER, Judy Recker, and
Jamie Recker, Appellants.

No. 95–2074.

Supreme Court of Iowa.

March 26, 1997.

Rehearing Denied April 18, 1997.

Gerald J. Kucera of the Tom Riley Law Firm, P.C., Cedar Rapids, for appellants.

David J. Dutton and Carolyn A. Rafferty of Dutton, Braun, Staack, Hellman & Iverson, P.L.C., Waterloo, for appellee.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

LAVORATO, Justice.

In this declaratory judgment action, the district court ruled that an insured was not entitled to underinsured motorist (UIM) benefits under an automobile policy because he had breached the policy's "consent-to-settlement" clause. We affirm.

## I. *Background Facts.*

Grinnell Mutual Reinsurance Company issued a family car policy to Dale and Judy Recker. The policy provided for $300,000 of UIM coverage. The UIM coverage provision provided:

**Part III... UNDERINSURED MOTORISTS**

We will pay damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an ... underinsured motor vehicle....

. . . .

We will pay under the Underinsured Motorists Coverage only after the limits of liability under applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

The UIM coverage was subject to the following exclusion:

**EXCLUSIONS:**

This coverage does not apply to bodily injury sustained by a person:

. . . .

(2) If that person or the legal representative of that person makes a settlement without our written consent.

The policy also had a provision regarding Grinnell's subrogation rights:

**Part V–GENERAL PROVISIONS**

**5. OUR RECOVERY RIGHTS**

In the event of any payment under this policy, we are entitled to all the rights of recovery of the person to whom payment was made against another. That person must sign and deliver to us any legal papers relating to that recovery, do whatever else is necessary to help us exercise those rights and do nothing after loss to prejudice our rights.

On September 19, 1991, Jamie Recker, son of the named insureds, was operating a motor vehicle insured under the Grinnell policy. Jamie was covered under the policy. The accident occurred at an unmarked rural intersection. Jamie was westbound and the other vehicle was northbound. Although Jamie apparently had the right-of-way, his vehicle entered the intersection just after the other vehicle. The front of the Reckers' vehicle struck the other vehicle in the side.

Sharff Farms, Inc. owned the other vehicle. Robert Knipper, a Sharff Farms employee, was driving it.

At the time, American Family Insurance Company insured both Sharff Farms and Knipper. Sharff Farms had $100,000 of liability coverage and Knipper had $25,000 of such coverage.

Jamie suffered serious injuries. His medical expenses eventually exceeded $60,000.

John Gorman was Grinnell's claims adjuster assigned to investigate the accident. He determined that Sharff Farms, a family farming corporation owned by the Reckers' neighbors, had nonexempt assets in excess of $300,000. Grinnell was therefore looking to Sharff Farms to pay damages suffered by Jamie in excess of the liability coverage American Family provided.

Several months after the accident, Gorman met with Jamie's parents and Jamie. Gorman told them that if Jamie wished to pursue his UIM claim, Grinnell would seek reimbursement from Sharff Farms through its subrogation rights under the policy. The Reckers told Gorman they were reluctant to file suit against Sharff Farms because the Sharffs were neighbors.

Gorman contacted Charles Sharff, an officer of Sharff Farms, about the amount of coverage Sharff Farms had. Sharff told Gorman the corporation only had $100,000 coverage. Gorman then told Sharff the corporation might be exposed to liability in excess of Sharff's policy limits.

Gorman had several more conversations with one or more of the Reckers in which he again stated that if Jamie pursued the UIM claim against Grinnell, Grinnell would seek reimbursement from Sharff Farms. In those conversations, Gorman also made it clear that in settling with Sharff Farms, (1) Jamie could not compromise Grinnell's subrogation rights and (2) Jamie had the responsibility to protect Grinnell's subrogation rights in any settlement with third parties. Dale Recker, an insurance adjuster himself, understood and agreed that it was Jamie's responsibility to protect Grinnell's subrogation rights in negotiating any settlement of his claim.

As mentioned, the Reckers were reluctant to sue their neighbors. Dale Recker asked Gorman if there was some way of avoiding such a lawsuit without jeopardizing Jamie's UIM claim against Grinnell. Gorman told Dale Recker this could not be done and told him that Sharff Farms had substantial assets from which Grinnell could recoup any payment it made to Jamie.

By the summer of 1993, Jamie's medical condition had stabilized and the medical damages were known. Although the Reckers consulted an attorney, they reached no agreement with him to handle Jamie's claim.

In the meantime, Grinnell was accumulating Jamie's medical records and other information about the claim.

Before late July, 1993, Gorman had told the Reckers that Grinnell's UIM coverage would not apply until American Family had offered the $125,000 policy limits. Until a June 29, 1993 memo from Gorman's supervisor to Gorman, Gorman was under the mistaken impression that American Family would first have to tender the policy limits before Grinnell's UIM coverage would apply.

In the June 29 memo, Gorman's supervisor informed him that he should promptly verify the American Family policy limits and then inform the Reckers they had two options:

(1) If Jamie wanted to settle with American Family for the policy limits and not make any UIM claim against Grinnell, Grinnell would file no lawsuit against Sharff Farms, or

(2) Jamie could make a UIM claim against Grinnell at which point Grinnell would pay Jamie the American Family $125,000 policy limits and then file suit against Sharff Farms.

The memo informed Gorman that one or the other option had to be pursued to protect Grinnell's subrogation rights.

On July 29 Gorman asked Dale Sharff whether he was willing to contribute to a settlement of Jamie's claim. Sharff told Gorman to contact Will Bland, an American Family representative.

The following day Gorman talked to Bland and told him that Grinnell might offer American Family's policy limits of $125,000 to Jamie and then pursue Sharff Farms and American Family. Bland doubted that Grinnell would have the authority to offer American Family's policy limits when American Family was not willing to do so. In addition, Bland told Gorman that American Family had not offered its policy limits to Jamie and that the company was still hopeful that it could settle for less than the policy limits.

Gorman's conversation with Bland raised questions in Gorman's mind. At this point Gorman thought his original notion was correct: It was necessary for American Family to *tender* the policy limits to trigger Grinnell's UIM coverage. Two of Gorman's memoranda—one dated August 9, 1993 and another dated September 7, 1993—reflect this thinking.

On August 16, 1993, Bland told Gorman that American Family had offered Jamie $100,000 to settle. On August 30 Dale Recker told Gorman that Jamie had been to a lawyer in Cedar Rapids and the lawyer would probably handle the claim from that point on. Dale also told Gorman that he believed American Family had offered $125,000 conditioned on a full release of Sharff Farms. Gorman again told Dale that Grinnell would provide no UIM coverage unless it could pursue its subrogation claim against Sharff Farms. Dale was upset at hearing this and responded that the UIM coverage was "not worth a hoot." Dale told Gorman that they had an appointment with an attorney that afternoon and probably would proceed with the attorney and let "the chips fall where they may." That afternoon, the Reckers met with their attorney, Gerald Kucera.

On September 7 Kucera made a demand to American Family for the $125,000 policy limits. On September 16 Jamie sued Sharff Farms and Knipper.

On September 20—one day after the statute of limitations would have expired—Jamie settled with American Family for the $125,000 policy limits and signed a release to Charles Sharff, Sharff Farms, and Knipper.

On October 5 Jamie dismissed his lawsuit against Sharff Farms and Knipper with prejudice. Jamie never contacted Grinnell to inform it of the lawsuit, settlement, release, or dismissal.

Several days later Gorman checked the clerk's office at the Fayette County courthouse where the suit was filed and discovered the petition and dismissal. He then contacted the Reckers and learned of the settlement.

## II. *Background Proceedings.*

After Jamie dismissed his lawsuit, Grinnell filed a petition for declaratory judgment against Jamie and his parents. The petition asked the court to declare that (1) the settlement, the release, and the dismissal of Jamie's lawsuit against Sharff Farms and Knipper constituted a breach of the "consent-to-settlement" clause of Grinnell's policy and (2) Grinnell was thereby prejudiced. The petition further asked for a determination that Grinnell had no further obligation to provide UIM benefits to Jamie.

The Reckers answered and counterclaimed. The counterclaim sought UIM benefits because Jamie's damages exceeded $425,000. The counterclaim also sought damages on the theories of breach of contract and bad faith because of the theories alleged in Grinnell's declaratory judgment action.

The Reckers filed a motion to adjudicate law points in which they asked the court to determine that the release given by Jamie "did not release Charles Scharff, Sharff Farms and Knipper for any rights that [Grinnell] may have against said persons pursuant to the terms of this Release." This prompted Charles Scharff, Sharff Farms and Knipper to intervene and seek a determination that the release given by Jamie did in fact relieve them from any claims asserted by Grinnell.

The release Jamie signed in his suit against Sharff Farms and Knipper contained the following language: "[T]he undersigned Releasor reserves any rights which he may have to underinsured insurance coverage applying to this action and injuries sustained." On the Reckers' motion for adjudication of law points, Judge Robert E. Mahan ruled that this language preserved Grinnell's right of subrogation against Sharff Farms and Knipper.

Later, following a hearing, Judge James L. Beeghly reconsidered this ruling and set it aside. Judge Beeghly noted that the earlier ruling

> apparently failed to take into account the fact the statute of limitations barred [Grinnell] from pursuing its claims against Charles Sharff, Sharff Farms, Incorporated and Robert Knipper, at the time of the Release on September 20, 1993. As a result, it cannot be said that the release of September 20, 1993, preserved Jamie Recker's claim for under-insurance coverage.

Neither the Reckers nor Grinnell appealed from this ruling in favor of the intervenor-tortfeasors.

In the same ruling, Judge Beeghly granted the intervenors' motion for summary judgment against Grinnell's previously filed cross-claim against the intervenors. In doing so the court stated:

> From the undisputed evidence it appears that the statute of limitation bars [Grinnell's] claim for contribution/indemnity from Charles Sharff, Sharff Farms, Inc. and Robert Knipper. [Grinnell's] subrogation rights against said tortfeasors are not greater than the rights of the insured, [Jamie] Recker.

Grinnell did not appeal the ruling on the intervenors' motion for summary judgment against Grinnell's cross-claim.

Judge Beeghly later heard the declaratory judgment action without a jury. He ruled that Jamie's settlement, release, and dismissal of his suit against Sharff Farms and Knipper constituted a breach of the "consent-to-settlement" clause of Grinnell's policy and that Grinnell was thereby prejudiced. The prejudice resulted, the court found, because the dismissal came after the statute of limitations had expired thereby barring Grinnell's subrogation rights. The court further ruled that because of the breach and prejudice, Grinnell had no further obligation to pay UIM benefits to Jamie.

The court also dismissed Jamie's counterclaim, finding that the filing of the declaratory judgment action in these circumstances neither constituted a breach of contract nor bad faith.

The Reckers appealed, contending that the district court erred in holding that Jamie was not entitled to UIM benefits because he had prejudiced Grinnell's rights of subrogation.

III. *Scope of Review.*

The parties agree this declaratory judgment action was tried at law. Our review is therefore for errors at law. Iowa R.App. P. 4; *AMCO Ins. Co. v. Rossman,* 518 N.W.2d 333, 334 (Iowa 1994). If substantial evidence supports the district court's findings of fact, we are bound by those findings. Iowa R.App. P. 14(f)(1); *Atwood v. City of Des Moines,* 485 N.W.2d 657, 659 (Iowa 1992). Evidence is substantial if reasonable minds would find it adequate to reach a conclusion. *Haberer v. Woodbury County Civil Serv. Comm'n,* 560 N.W.2d 571, 577 (Iowa 1997). We, however, are not bound by the district court's conclusions of law, and we may inquire into whether the court's ultimate conclusions were materially affected by improper conclusions of law. *Atwood,* 485 N.W.2d at 659.

IV. *Breach of the Consent–to–Settlement Clause.*

A. *The law generally.* Although an insured may reject UIM coverage, every automobile liability insurance policy delivered or issued for delivery in this state must provide such coverage. Iowa Code § 516A.1 (1991). The purpose of UIM coverage is to provide protection from loss caused by a tortfeasor who is not financially responsible. *American States Ins. Co. v. Tollari,* 362 N.W.2d 519, 522 (Iowa 1985). If the tortfeasor's liability insurance is not enough to fully compensate the insured's loss, the insured can, under the insured's own UIM coverage, recover the loss minus the insured's recovery from the tortfeasor's liability insurance, subject to the limit of the UIM coverage. *Id.* In making recovery under both policies, the insured however is not entitled to any duplication of benefits. *Id.*

A standard automobile insurance policy imposes specific duties upon policyholders who buy UIM coverage. These duties include the obligation to notify the insurer of the accident, to cooperate with the investigation and defense of any claim, to forward copies of all legal papers if suit is brought, and to preserve the insurer's subrogation rights against the tortfeasor. *See Green v. Selective Ins. Co. of Am.,* 144 N.J. 344, 349, 676 A.2d 1074, 1077 (1996). Here we are concerned with the duty to cooperate and the duty to protect the insurer's subrogation rights against the tortfeasor. As we shall see, the two duties are interrelated.

1. *Duty to cooperate.* An exclusion found in the UIM coverage of Grinnell's policy provides that such coverage does not apply if the covered person or that person's representative "makes a settlement without [Grinnell's] written consent." Thus, this consent-to-settlement clause in effect imposes a duty on the covered person, a breach of which may result in the loss of UIM coverage.

We recently held this type of provision is a valid and enforceable way of protecting a UIM insurer's subrogation rights against the tortfeasor. *Kapadia v. Preferred Risk Mut. Ins. Co.,* 418 N.W.2d 848, 852 (Iowa 1988). The consent-to-settlement clause also protects the UIM insurer against the possibility of collusion between its insured and the tortfeasor at the expense of the UIM insurer. *Lambert v. State Farm Mut. Auto. Ins. Co.,* 576 So.2d 160, 164 (Ala.1991); Thomas H. Fell, Note, *Underinsured Motorist Coverage: The Validity of Consent to Settle ·Clauses,* 37 Drake L.Rev. 503, 505 (1987–1988).

If the UIM insurer proves that a breach of the consent-to-settlement clause prejudices the insurer's right to subrogation against the tortfeasor, the covered person loses UIM coverage. *Kapadia,* 418 N.W.2d at 852. The insurer must prove, however, that absent the breach it could have collected from the tortfeasor. *Id.*

In *Kapadia,* we did not reach the question whether there was prejudice. The district court had simply sustained the insurer's motion for summary judgment because of the insured's breach of the consent-to-settlement clause. *Id.* We remanded because we thought there was a fact question on the prejudice issue. *Id.*

Our court of appeals reached the prejudice issue in *Hale v. Classified Insurance Co.,* 535 N.W.2d 164, 168 (Iowa App.1995). In *Hale,* the policy containing the UIM coverage had a consent-to-settlement clause and a subrogation provision virtually identical to Grinnell's. *Hale,* 535 N.W.2d at 166. The

insured reached a settlement with the tortfeasor without first notifying her UIM insurer. *Id.* The insured gave the tortfeasor a general release which precluded the UIM insurer from recovering against the tortfeasor under the UIM insurer's subrogation provision. *Id.* Affidavits supporting the insurer's motion for summary judgment showed that the tortfeasor was a going concern that had assets sufficient to satisfy a judgment to the limits of the insurer's UIM coverage. *Id.* at 168. With that, the court of appeals upheld the district court's grant of a summary judgment in favor of the UIM insurer on the grounds that the insured had breached the consent-to-settlement clause and the breach was prejudicial to the UIM insurer. *Id.*

2. *Subrogation.* As mentioned, the Grinnell policy had a subrogation provision. In the event Grinnell paid UIM benefits, the provision "entitled [Grinnell] to all the rights of recovery of the person to whom payment was made against another." In *Kapadia,* we held such a subrogation provision is valid and consistent with our UIM law in Iowa Code chapter 516A. 418 N.W.2d at 851.

In the context of insurance law, subrogation has been defined as "the right of the insurer to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss paid by the insurer." *Hermeling v. Minnesota Fire & Cas. Co.,* 548 N.W.2d 270, 273 (Minn.1996) (quoting 16 George J. Couch, Couch Cyclopedia of Insurance Law § 61:1 (2d ed. 1983)). The principles of subrogation provide that

[a] subrogee has no greater rights than those of the subrogor. The subrogee merely steps into the shoes of the subrogor. The claim of a subrogee is derivative of the claim of the subrogor, and only changes the ownership of the claim. The subrogee gains only the right to prosecute against third parties whatever rights the subrogor possesses against them. The right of subrogation remains inchoate until such time as the subrogee makes a payment. The cause of action in subrogation therefore accrues prior to payment, but is

not ripe for adjudication until payment is made by the subrogee.

*Id.* (citations omitted); *see also Kapadia,* 418 N.W.2d at 852 ("Finally, although the extent of the contractual subrogation right is not fixed until a loss payment is made, a contingent subrogation right in favor of the insurer arises when the loss occurs. This right is protected by the consent-to-settlement clause as well.") (citation omitted).

3. *Subrogation and statute of limitations.* According to one treatise writer,

[s]ince the insurer's claim by subrogation is derivative from that of the insured, it is subject to the same statute of limitations as though the cause of action were sued upon by the insured. Consequently, the insurer's action is barred if it sues after expiration of the period allowed for the suing out of tort claims.

16 George J. Couch, Couch Cyclopedia of Insurance Law § 61:234 (2d ed. 1983); *accord Hermeling,* 548 N.W.2d at 275; *St. Paul Fire & Marine Ins. Co. v. Glassing,* 269 Mont. 76, 79–81, 887 P.2d 218, 220–21 (1994); Jane M. Draper, Annotation, *When Does Statute of Limitations Begin to Run Upon an Action by Subrogated Insurer Against Third–Party Tortfeasor?,* 91 A.L.R.3d 844, 847 (1979).

4. *Exhaustion clause.* Like many UIM coverage provisions, Grinnell's UIM coverage provision has an exhaustion clause, and it provides:

We will pay under the Underinsured Motorists Coverage only after the limits of liability under applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

According to this provision, UIM coverage is not triggered until the injured party has exhausted the policy limits of the tortfeasor's policy. We have held such provisions unenforceable because they violate public policy. *In re Estate of Rucker v. National Gen. Ins. Co.,* 442 N.W.2d 113, 116 (Iowa 1989). When an injured party settles with a tortfeasor's liability carrier, that party is now assumed—for UIM coverage purposes—to have received the policy limits of the tortfeasor's

liability policy. *Id.* at 117. Thus, under UIM coverage, the injured party may only recover the difference between the liability policy limit and the damages suffered, subject to the UIM policy limits. *Id.*

B. *The merits.* The evidence supports the district court's finding that Jamie filed suit against the tortfeasors—Sharff Farms and Knipper—on September 16, 1993. This was three days before the statute of limitations was to expire. *See* Iowa Code § 614.1(2) (two year statute of limitations for personal injuries).

■ By filing suit within the allowed time period, we think Jamie tolled the statute of limitations both as to his own claim and as to Grinnell's contingent subrogation claim. Contrary to the Reckers' contention, the circumstances here are not like those in *Gookin v. Norris,* 261 N.W.2d 692 (Iowa 1978). In *Gookin,* a minor sustained injuries in an automobile collision. *Gookin,* 261 N.W.2d at 693. The father paid the minor's medical expenses. When the minor attained his majority, he filed suit on account of his injuries. *Id.* By this time the statute of limitations had run on the father's medical expense claim but not on the son's claim. *Id.* After the son filed the lawsuit, the father assigned his medical expense claim to the son. *Id.* This court held that the assignment did not avoid the statute of limitations and the claim was therefore time-barred. *Id.* at 694.

■ The Reckers correctly cite *Gookin* for the principle that one may not avoid the statute of limitations through assignment. The rule applies where two persons have independent claims against a defendant and only one person commences an action in a timely manner. The person who does not commence an action in a timely manner may not avoid the statute of limitations by assigning his or her claim to the person who does. *Id.* In *Gookin,* because the medical expense claim belonged to the father rather than to the son, the statute of limitations barred the father's claim notwithstanding the assignment. *Id.* at 695.

The case before us now, however, does not involve the assignment of an independent claim but rather the right of subrogation within a single claim. Grinnell's contingent subrogation claim is not independent of Jamie's claim but is dependent upon, or derivative from, his claim. "Derivative" is defined as "[a]nything obtained or deduced from another." Black's Law Dictionary 443 (6th ed. 1990). Because of Grinnell's contingent subrogation claim, which was protected by the consent-to-settlement clause, Grinnell could upon payment of the UIM claim step into Jamie's shoes and have the same rights against the tortfeasor that Jamie had. If Jamie's suit tolled the statute of limitations as to his claim, the suit likewise tolled the statute as to Grinnell's contingent subrogation claim.

■ Once Jamie received the policy limits offer from American Family, he had a duty under the consent-to-settlement clause to notify Grinnell of the proposed settlement and receive Grinnell's written consent to the settlement. Grinnell could then have protected its contingent subrogation rights by tendering an amount equal to the tortfeasors' settlement offer and substituting its payment for that of the offer. *See* 3 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 43.6, at 350–352 (2d ed. 1995) (collecting cases allowing insurer to tender amount of settlement and substituting its payment for the offer as a way of protecting insurer's contingent subrogation claim).

Once having paid this amount, Grinnell's contingent subrogation claim would have been ripe for adjudication. *See Hermeling,* 548 N.W.2d at 273. By virtue of the payment, Grinnell would have been entitled to step into Jamie's shoes and prosecute against the tortfeasors whatever rights Jamie had against them to the extent of Grinnell's payment. *Id.*

■ However, by settling with the tortfeasors *after* the statute of limitations had expired, Jamie effectively precluded Grinnell from exercising its subrogation rights because such rights were now time-barred by the statute of limitations.

The record evidence supports the court's finding that Jamie failed to give Grinnell notice of the settlement and thereby afford

Grinnell the opportunity to exercise its subrogation rights.

The record evidence further supports the court's finding that Sharff Farms had sufficient nonexempt assets to pay for damages in excess of the $125,000 liability policy limits. Jamie's breach of the consent-to-settlement clause prejudiced Grinnell because Grinnell could not now prosecute the case to conclusion against the tortfeasors whose nonexempt assets were available to pay Jamie's UIM claim. Because of such breach and prejudice, the district court correctly concluded Jamie relinquished his claim for UIM benefits.

Left for our resolution are various challenges the Reckers raise to the district court's ruling denying Jamie's UIM policy benefits.

1. *The release.* The Reckers first contend that the district court "made several erroneous findings of fact, including the statement that Jamie Recker gave a full release" to Charles Sharff, Sharff Farms, and Knipper. As mentioned, Judge Mahan ruled that Jamie had not given a full release and had indeed preserved his UIM claim and had done nothing to destroy Grinnell's subrogation rights.

In setting aside Judge Mahan's ruling, Judge Beeghly did *not* rule that Jamie had given a full release. Judge Beeghly simply ruled that the release was given after the statute of limitations had expired thereby barring Grinnell's subrogation claim against the tortfeasors. Neither Grinnell nor the Reckers appealed this decision in favor of the intervenors; therefore, the ruling became the law of the case.

2. *Accrual of Grinnell's subrogation rights.* The Reckers next contend that subrogation rights do not accrue until the insurer makes payment. Because Grinnell made no payment, the Reckers argue Grinnell had no subrogation rights when the statute of limitations expired. Therefore, they conclude, nothing Jamie did prejudiced Grinnell's subrogation rights.

As mentioned, a contingent subrogation right accrues in favor of the insurer on the date of the loss. *Kapadia,* 418 N.W.2d

at 852. This right is protected by the consent-to-settlement clause. *Id.* Grinnell's contingent subrogation right therefore accrued on the date of the accident and that right was protected by the consent-to-settlement clause in the UIM coverage provision.

As mentioned, when Jamie filed suit against the tortfeasors, the suit not only tolled the statute of limitations as to his claim but also as to Grinnell's contingent subrogation claim.

Had Jamie notified Grinnell of the $125,000 offer and sought its consent to settlement, Grinnell could have paid Jamie the $125,000. Together with Jamie, Grinnell could then have prosecuted the lawsuit in an attempt to recoup the $125,000 from American Family and any UIM claim in excess of those limits from the tortfeasors.

3. *Waiver.* The Reckers' final contention raises a waiver issue. They contend the rule is that an insurer who refuses to provide UIM coverage waives its right to rely upon the consent-to-settlement clause. The Reckers insist that Grinnell refused to provide UIM coverage and therefore waived any right it had to rely upon the consent-to-settlement clause.

Courts have held that a UIM insurer's refusal to pay UIM benefits waives the UIM insurer's subrogation rights against the tortfeasor. *See, e.g., Lambert,* 576 So.2d at 167. The only record evidence to support the Reckers' contention that Grinnell refused to provide UIM coverage is Grinnell's refusal to pay UIM benefits after Jamie had settled and dismissed his lawsuit. There is no record evidence that Grinnell ever refused to pay such benefits before that time.

Grinnell was relying on its policy provision requiring exhaustion of the tortfeasors' liability limits *before* paying UIM benefits; it was not absolutely refusing to pay such benefits to Jamie. Although Grinnell was mistakenly relying on an exhaustion provision that was invalid under *In re Estate of Rucker,* such reliance did not rise to the level of an absolute refusal to pay.

V. *Other Issues.* Like the district court we also find that—contrary to the

Reckers' contention—Grinnell's filing of this declaratory judgment did not constitute a breach of contract or bad faith. Jamie's breach of the consent-to-settlement clause and the resulting prejudice to Grinnell provided a reasonable basis for Grinnell to deny the UIM claim and to bring this declaratory judgment action seeking a judicial ruling upholding that denial. *See Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 858 (Iowa 1991) (holding that one element of a bad faith action involving a denial of a UIM claim is that there is no reasonable basis for denying the claim).

Our decision on the UIM, breach of contract, and bad faith claims makes it unnecessary for us to reach the Reckers' abuse-of-discretion contention regarding a discovery issue.

### VI. *Disposition.*

Because there was substantial evidence to support the district court's decision regarding the UIM, breach of contract, and bad faith claims, we affirm.

**AFFIRMED.**